**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>JEFFREY WINICK<br><br>Debtor. | Chapter 7<br>No. 20-11976 (SHL) |
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>- against –<br><br>JEFFREY WINICK<br><br>Defendant. | Adversary Proceeding No. _________ |

**Complaint to Object to Discharge or, Alternatively, Determine Nondischargeability**

Plaintiff the United States of America (the "United States"), on behalf of the Internal Revenue Service ("IRS"), by and through its attorney, Audrey Strauss, United States Attorney for the Southern District of New York, brings this adversary proceeding, authorized and requested by a delegate of the Secretary of the Treasury and brought at the direction of the Attorney General of the United States pursuant to the provisions of 26 U.S.C. § 7401, to obtain a judgment against Defendant Jeffrey Winick determining: (1) that Mr. Winick is not entitled to discharge pursuant to 11 U.S.C. §§ 727(a)(2) and (a)(4); or, if a discharge is granted, (2) that Mr. Winick's federal income tax liability for tax year 2019 is nondischargeable under 11 U.S.C. §§ 523(a)(1)(A) and 507(a)(8)(A)(i); and (3) that Mr. Winick's federal income tax liabilities for tax years 2012 through 2016 and 2019 are nondischargeable under 11 U.S.C. § 523(a)(1)(C). The United States hereby alleges upon information and belief as follows:

## INTRODUCTION

1. On August 27, 2020, Jeffrey Winick filed for bankruptcy under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in an effort to obtain a discharge of millions of dollars of tax liabilities owed to the IRS—his single largest creditor, holding approximately 90% of his debts—without sacrificing the luxuries and business interests he has obtained over the years.

2. Mr. Winick is a sophisticated professional. For decades, he has been a top commercial real-estate broker in the New York City area. He currently owns a majority interest in, and serves as Chief Executive Officer of, Winick Realty Group LLC ("Winick Realty"), an entity that—according to its website—"has been driving New York City's retail transformation for over 35 years and has since expanded its reach to encompass the entire United States."

3. In that capacity, Mr. Winick earned millions of dollars a year between 2012 and 2016 and his cumulative reported taxable income for those years was over $23 million. This income enabled Mr. Winick to live a life of luxury, renting high-end apartments in New York City while maintaining a second address in Southampton, driving luxury cars and speedboats, gambling at high-stakes casinos, and spending tens-of-thousands of dollars a month so that his daughter could experience the same luxury while attending New York University.

4. But at the same time, Mr. Winick ignored most of the millions of dollars in tax obligations that come with having tens of millions of dollars in income. He consistently under-withheld taxes from his income by large margins and ensured that the IRS would not be able to collect against him by renting and leasing his residences and cars, transferring valuable property to his daughter for no consideration, and favoring debts owed to his friends over those owed to his single largest creditor, the IRS.

5. Rather than enter bankruptcy honestly in search of a fresh start, Mr. Winick continued his pattern of tax evasion in the lead up to his Chapter 7 filing—siphoning off valuable assets to his preferred creditors to further frustrate the IRS's ability to collect the debts owed to it and concealing the true value of his assets in hopes that he would not have to give them up in order to take advantage of a Chapter 7 discharge.

6. As such, the IRS objects to Mr. Winick's discharge under 11 U.S.C. § 727 (Counts I and II), and alternatively seeks judgment that his tax debts are excepted from discharge under 11 U.S.C. § 523(a) (Counts III and IV).

## JURISDICTION AND VENUE

7. This is an adversary proceeding under Federal Rule of Bankruptcy Procedure 7001, brought pursuant to 11 U.S.C. § 727(a) to object to the discharge sought by Mr. Winick through this bankruptcy, and otherwise to determine that Mr. Winick's debts owed to the IRS are excepted from discharge under 11 U.S.C. § 523(a).

8. The district court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and this case is referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a) and the Southern District of New York's Amended Standing Order of Reference Re: Title 11, M10-468, 12 Misc. 00032, dated January 31, 2012 (Preska, C.J.).

9. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), (J).

10. Venue in this district is proper pursuant to 28 U.S.C. § 1409.

## THE PARTIES

11. The Plaintiff is the United States of America, on behalf of the IRS.

12. The Defendant, Jeffrey Winick, is the debtor in the associated bankruptcy proceeding, No. 20-11976, brought under Chapter 7 of the Bankruptcy Code. He resides at 420 East 54th Street, Apartment 3202, New York, New York 10022.

## FACTUAL ALLEGATIONS

A. The Bankruptcy Proceedings

13. On August 27, 2020, Mr. Winick filed a voluntary petition for bankruptcy pursuant to Chapter 7 of the Bankruptcy Code, and also filed his schedules of assets and liabilities and his Statement of Financial Affairs.

14. In his Schedule A/B, Mr. Winick disclosed that he possessed property valued at $530,000.00, consisting of $30,000.00 in personal and household items, including two Rolex watches that he valued at $5,000.00; $25,000.00 in financial assets; and $475,000.00 in leasing brokerage commissions that he had already earned but not yet collected. Mr. Winick also listed that he possessed a 22.5% ownership interest in Winick Realty of "unknown" value and a 60% ownership interest in WTN Realty Corp. ("WTN"), also of "unknown" value.

15. In his Schedule C, Mr. Winick claimed that $20,000.00 of his personal and household items, including his Rolex watches, and $12,000.00 in his financial assets, were exempt property.

16. In his Schedule D, Mr. Winick scheduled $8,528,845.56 in liabilities owed to the IRS arising between December 31, 2012 and December 31, 2016. Mr. Winick also scheduled $779,617.56 in liabilities owed to the New York State Department of Taxation arising between December 31, 2014 and December 31, 2017. Mr. Winick did not list any other secured creditors in his Schedule D.

17. In his Schedule E, Mr. Winick scheduled a $400,000.00 priority unsecured claim for the IRS incurred between 2019 and 2020. In addition, he scheduled $337,849.31 in unsecured claims owed to his daughter for a personal loan, and an unsecured claim of unknown value owed to DOLP 655 Properties II LLC. Mr. Winick did not schedule any additional unsecured claims.

18. In his Schedule I, Mr. Winick noted that he was a real estate broker with Winick Realty and that he received $122,800.00 in wages, salary, and commissions—$75,900.00 net of taxes—per month. Mr. Winick further listed that his monthly expenses were $149,226.66, totaling $15,226.66 in personal expenses and $134,000.00 in payment plans for back taxes owed to the IRS and New York State. However, Mr. Winick had not made any payments to the IRS in the six months preceding his bankruptcy filing.

19. In Mr. Winick's Statement of Financial Affairs, he noted that he previously possessed a 24% interest in SDSDR111 LLC, a Delaware limited liability company, valued at $1,500,000.00, but that his interest in that property was attached, seized, or levied by David I. Berley within a year of his bankruptcy filing.

20. After Mr. Winick filed for bankruptcy, Gregory Messers, the Chapter 7 Trustee (the "Trustee"), sought an appraisal of the two Rolex watches that Mr. Winick had valued at $5,000.00. Christi Sothers Fine Jewelry conducted an appraisal of these watches and determined that they were valued at $47,500.00. Thereafter, Mr. Winick and the Trustee entered a stipulation allowing for the sale of those watches to Mr. Winick's son-in-law, Mark Lapidus, for $45,000.00, subject to higher bidders, which the Court approved on March 9, 2021.

21. The Trustee has also filed a motion to abandon the estate's interests in Winick Realty and WTN, which Mr. Winick had scheduled as having "unknown" value. The Trustee

argued that those interests were valueless. The IRS has opposed this motion, which remains pending.

22. Despite there being $475,000.00 in leasing brokerage commissions listed in Mr. Winick's schedules, the Trustee has not yet collected any leasing brokerage commissions, even though many of these commissions being due and payable.

B. Mr. Winick's Debts to the IRS

23. On November 6, 2020, the IRS filed a proof of claim in Mr. Winick's bankruptcy proceeding listing the following income tax liabilities owed by Mr. Winick to the IRS:

| Tax Period | Date Tax Assessed | Tax Due ($) | Penalties Due as of Petition Date ($) | Interest Due as of Petition Date ($) | Total Due as of Petition Date ($) | Date Notice of Tax Lien Recorded |
|---|---|---|---|---|---|---|
| 2012 | 11/18/2013 | 356,509.00 | 627,999.45 | 436,044.75 | 1,420,553.02 | 05/19/2014 |
| 2013 | 11/24/2014 | 1,386,429.00 | 416,699.65 | 413,433.23 | 2,216,561.88 | 08/12/2015 |
| 2014 | 09/28/2015 | 1,824,015.00 | 548,181.72 | 473,941.12 | 2,846,137.84 | 10/25/2015 |
| 2015 | 11/21/2016 | 701,715.00 | 207,987.26 | 155,801.40 | 1,065,503.66 | 11/27/2018 |
| 2016 | 06/05/2017 | 744,488.00 | 132,922.09 | 129,695.05 | 1,007,105.14 | 11/27/2018 |
| 2019 | 08/17/2020 | 334,146.00 | 5,084.12 | 1,179.76 | 340,409.88 | |
| Total | | 5,347,302.00 | 1,938,874.29 | 1,619,095.31 | 8,905,271.60 | |

24. Mr. Winick reported $7,922,503.00 in taxable income in 2012, giving rise to $2,958,768.00 in income taxes, but withheld only $676,747.00 from his income. To date, in addition to this initial withholding, Mr. Winick has made approximately $1,916,000.00 in payments toward this liability through installment agreements entered into with the IRS, and as pre-payment for the consideration of an offer in compromise (discussed in more detail *infra* at paragraphs 31-37). Penalties and interest continue to accrue.

25. Mr. Winick reported $4,675,510.00 in taxable income in 2013, giving rise to $1,944,528.00 in income taxes, but withheld only $558,099.00 from his income. To date, Mr. Winick has not made any additional payments, either by installment agreement or voluntarily, on this liability. Penalties and interest continue to accrue.

26. Mr. Winick reported $4,991,103.00 in taxable income in 2014, giving rise to $2,100,533.00 in income taxes, but withheld only $276,518.00 from his income. To date, Mr. Winick has not made any additional payments, either by installment agreement or voluntarily, on this liability. Penalties and interest continue to accrue.

27. Mr. Winick reported $3,891,521.00 in taxable income in 2015, giving rise to $1,578,350.00 in income taxes, but withheld only $876,635.00 from his income. To date, Mr. Winick has not made any additional payments, either by installment agreement or voluntarily, on this liability. Penalties and interest continue to accrue.

28. Mr. Winick reported $2,412,311.00 in taxable income in 2016, giving rise to $995,865.00 in income taxes, but withheld only $251,377.00 from his income. To date, Mr. Winick has not made any additional payments, either by installment agreement or voluntarily, on this liability. Penalties and interest continue to accrue.

29. Mr. Winick filed his 2019 income tax return on April 15, 2020. This return reported $2,684,093.00 in taxable income in 2019, giving rise to $1,010,258.00 in income taxes, but withheld only $676,112.00 from his income. To date, Mr. Winick has not made any additional payments, either by installment agreement or voluntarily, on this liability. Penalties and interest continue to accrue.

30. Because Mr. Winick realized significant income against which he did not withhold taxes, he was required to make quarterly estimated tax payments pursuant to 26 U.S.C. § 6654. However, between 2012 and 2016, Mr. Winick consistently failed to make these quarterly payments. On numerous occasions, the IRS reminded Mr. Winick of his obligation to make these payments, and he incurred penalties for failing to do so in each of the tax years discussed above.

C. Mr. Winick's Payment History

31. In total, before accounting for payments made to date as reflected in the chart above, Mr. Winick incurred $10,588,302.00 in tax liabilities for tax years 2012 through 2016 and 2019, not including the interest and penalties that accrued on the unpaid amounts. To date, Mr. Winick has made $3,315,488.00 in payments toward those liabilities through tax withholdings, and approximately $1,916,000.00 in additional payments, predominantly through three separate installment agreements with the IRS. These additional payments have all been credited against Mr. Winick's 2012 tax liabilities. These additional payments have not been of sufficient value to cover even the principal due for the 2012 tax year, given the magnitude of Mr. Winick's under-withholding. Mr. Winick has made no payments towards his liabilities for tax years 2013 through 2016 or 2019 apart from the taxes he under-withheld from his income. Inclusive of penalties and interest, Mr. Winick owed $8,905,271.60 to the IRS as of the date he filed for bankruptcy.

32. As noted above, Mr. Winick has entered into three separate installment agreements with the IRS to pay back his 2012 through 2016 tax liabilities. As detailed below, Mr. Winick defaulted on each of these agreements.

33. The IRS first approved an installment agreement with Mr. Winick to pay back his tax liabilities in July 2014. Under the terms of that agreement, proposed by Mr. Winick, he was to pay $50,000.00 per month through November 2014, with that payment amount then increasing to $100,000.00 per month until his liabilities had been paid off. Mr. Winick made payments pursuant to this agreement through September 2014, then ceased making payments. Mr. Winick also made three payments to the IRS—$25,000.00 in January 2014, $50,000.00 in May 2014, and $50,000 in June 2014—while discussing this installment agreement with the IRS. The IRS removed Mr. Winick's installment agreement status in March 2015.

34. The IRS approved a second installment agreement with Mr. Winick in October 2015. Pursuant to that agreement, Mr. Winick was to pay $50,000.00 per month from November 2015 through November 2017, with that amount increasing to $75,000.00 per month at that time. Mr. Winick made payments pursuant to this plan from November 2015 through July 2016, made partial payments of $25,000.00 per month from August 2016 through December 2016, then ceased making payments. Mr. Winick also made several payments to the IRS while his installment agreement was pending, valued as follows: $25,000.00 in April 2015, $30,000.00 in May 2015, and $50,000 in June, July, August, September, and October 2015. The IRS removed Mr. Winick's installment agreement status in March 2017.

35. Finally, the IRS established a third installment agreement with Mr. Winick in November 2018. Under the terms of that agreement, Mr. Winick was required to pay $50,000.00 per month between November 2018 and December 2019, at which point he would be required to increase his payments to $114,000.00 per month in order to fully pay his outstanding liabilities within the limitations period. Mr. Winick made payments pursuant to this plan between November 2018 and November 2019.[1] He made two additional $50,000.00 partial payments in December 2019 and January 2020. Mr. Winick then defaulted on this agreement and has made no payments to the IRS since.

36. In addition to these payments related to installment agreements, on May 15, 2017, Mr. Winick submitted an offer-in-compromise, including a $86,000.00 prepayment, to the IRS offering $430,000.00 to compromise the over $7,000,000.00 in tax liabilities that he owed to the IRS at that time. Following several months of discussions between the IRS and Mr. Winick's

[1] Mr. Winick's payment for January 2019 was dishonored and he never paid the amount owed under the agreement for that month. As a result, his installment agreement was found to be in default, and had to be reinstated in June 2019.

attorney, in September 2018, the IRS informed Mr. Winick's attorney that his offer would be rejected. Mr. Winick withdrew his offer-in-compromise shortly thereafter. While Mr. Winick's offer-in-compromise was pending, the IRS was precluded from levying Mr. Winick's property pursuant to 26 U.S.C. § 6331(k)(1).

37. In total, apart from his yearly withholdings, Mr. Winick has made approximately $1,916,000.00 in payments on his 2012 through 2016 and 2019 tax liabilities. This amount is less than the total principal owed just for tax year 2012 alone, when Mr. Winick significantly under-withheld on his $7,922,503.00 in taxable earnings. Mr. Winick has never made a voluntary payment toward these liabilities, other than in anticipation of or in connection with an installment agreement or offer-in-compromise, and other than insufficient withholdings before the relevant return was filed.

D. Mr. Winick's Lavish Lifestyle

38. As Mr. Winick accrued millions of dollars in tax, penalty, and interest liabilities between 2012 and 2016 without making payments towards these liabilities other than those described above, he spent exorbitantly to fund a lavish lifestyle for himself and his family. In the following paragraphs, the 2014 tax year is presented as an example.

39. As noted above, Mr. Winick earned $4,991,103.00 in taxable income in 2014, giving rise to $2,100,533.00 in income taxes, but withheld only $276,518.00 from his income. This significant under-withholding came on the tail of two years in which Mr. Winick had also significantly under-withheld: he withheld only $676,747.00 on a $2,958,768.00 liability in 2012, and $558,099.00 on a $1,944,528.00 liability in 2013.

40. Yet in 2014, Mr. Winick maintained a $17,000.00 per month lease for Apartment 31B at the River Tower, 420 E. 54th Street, New York, New York 10022; a $15,000.00 per month

lease for a second residence at 24 Parrish Pond Lane, Southampton, New York 11968; and spent $18,000.00 per month on New York University tuition and living expenses—including a $7,000.00 per month apartment—for his daughter Danielle.

41. These costs are only a portion of what Mr. Winick spent maintaining his properties. For example, in the same year, Mr. Winick incurred the following expenses related to just the maintenance of his Southampton property: $4,045.01 for cable to DirecTV; $1,493.60 for internet to Optimum, $8,229.98 in electric bills to PSEG Long Island; $1,455.10 in water bills to the Suffolk County Water Authority; $1,894.42 in mechanical maintenance fees to W&G Service Company, Inc.; $3,400.00 in homeowners association fees; and $7,058.56 in pest-control fees to Premier Pest Control.

42. These property-related expenses do not paint a full picture of Mr. Winick's finances. For example, Mr. Winick incurred a yearly charge of $5,846.25 on a boat slip for his thirty-four-foot Cobalt 302 boat between April and November 2012, and $6,119.44 for the same in 2013. On information and belief, Mr. Winick sold his boat in fall 2014 without making a voluntary tax payment out of the proceeds.

43. Upon further information and belief, Mr. Winick also incurred other substantial entertainment expenses, including significant gambling-related expenses, *see* Statement of Financial Affairs at 7; Dkt. No. 51 ¶ 6, both in 2014 and other years relevant to this lawsuit.

44. Mr. Winick also incurred significant expenses on luxury goods paid for through his company, Winick Realty. For example, in 2014, Mr. Winick was the guarantor on two vehicle leases, one for a 2013 Mercedes-Benz SL550 at $1,827.72 per month and one for a 2014 Mercedes-Benz GL550 at $1,580.13 per month. Although these leases were taken out in the name of Winick Realty, they both listed Mr. Winick's Southampton address as their principal garage location.

45. These 2014 expenses are offered as examples of the significant expenditures made by Mr. Winick while he ignored his obligations to the IRS. On information and belief, Mr. Winick incurred additional unnecessary expenses throughout the period in which he has been ignoring his tax obligations.

E. Efforts to Prevent Collection

46. On top of Mr. Winick's under-withholdings, consistent failure to abide by the terms of his installment agreements with the IRS, and extravagant spending, Mr. Winick structured his finances in a manner that protected his wealth from collection by the IRS.

47. First, Mr. Winick is the controlling shareholder in both Winick Realty and WTN. Pursuant to their operating and shareholder agreements, Mr. Winick has complete control over the affairs of these entities. Mr. Winick exercises that control to utilize these entities as a personal piggy bank.

(a) For example, between 2011 and 2021, Winick Realty has spent at least $330,000.00 on leases for Mercedes Benz's, guaranteed by Mr. Winick. Although these leases all indicate that the Mercedes are to be used for "business, commercial, or agricultural purposes," each lists Mr. Winick's Southampton residence, rather than Winick Realty's Manhattan address, as their "principal garage location."

(b) Similarly, Mr. Winick uses Winick Realty to service his personal debts. For example, in and around November 2019, Winick Realty's Chief Operating Officer Louis Eisenger was actively involved in the re-negotiation of two personal debts owed by Mr. Winick to his friend and creditor David Berley. The resulting agreement for repayment of Mr. Winick's personal debts permitted payments owed to Winick Realty to be redirected to pay Mr. Winick's creditor. In other

words, Winick Realty paid Mr. Winick's personal debts directly, rather than paying Mr. Winick taxable income, from which he could pay his own debts.

48. Second, Mr. Winick has been transferring substantial assets to his friends and family members throughout the period he has been delinquent on his obligations to the IRS.

(a) For example, in December 2012—the same year that Mr. Winick incurred an over $2,000,000.00 tax liability—Mr. Winick transferred a 40% interest in WTN to his daughter for no consideration. On the stock transfer document, he indicated that this interest in WTN had a value of $4,000,000.00. Several months later, in May 2013, Mr. Winick's accountants wrote to the IRS to express their opinion that the interest was valued at $1,467,180.00.

(b) Similarly, in 2012, Mr. Winick transferred a 74% interest in Winick Realty Group NJ, LLC—the New Jersey affiliate of Winick Realty—to a trust, with his daughter as beneficiary. The trust assigned that interest to Mr. Winick's daughter in January 2016, with that transaction signed off on by Mr. Winick as the administrative manager of the trust.

(c) As explained further below, in 2015, Mr. Winick pledged an interest worth millions of dollars in an entity named SDSDR111 LLC to secure a loan from a friend despite having knowledge that the IRS had a lien on his SDSDR111 LLC interest.

(d) In 2020, Mr. Winick surrendered his interest in SDSDR111 LLC to his friend in satisfaction of his debt rather than using it to pay his debts to the IRS. Mr. Winick surrendered this interest even though the property may have been sold for a sum that exceeded the debt owed to his friend.

(e) And Mr. Winick also divested himself of his second home at 24 Parrish Pond Lane in Southampton, while continuing to reap the benefits of living there. Around 2004, soon after the house was built, Mr. Winick sold it to a trust, with his daughter as beneficiary, for

$1,250,000.00. In 2016, the trust transferred the property to Mr. Winick's daughter at Mr. Winick's direction. Upon information and belief, Mr. Winick continued to live in the Southampton property as a second residence until his daughter sold that property in 2020 for $3,550,000.00.

49. Finally, Mr. Winick has ensured that he has not maintained valuable assets that the IRS could seize. Rather than own real property, Mr. Winick has rented high-end properties in Manhattan and Southampton and lived in residences in his daughter's name. Rather than own cars, Mr. Winick has relied upon leases taken out by his company. And where Mr. Winick owned substantial assets—like boats and business interests—he quickly divested himself of them when he fell behind on his tax payments.

50. As a result, at the time Mr. Winick entered bankruptcy in August 2020, he claimed that he owned no real property, no vehicles, only $30,000.00 in personal and household items, only $25,000.00 in financial assets, and two business interests of unknown value. Mr. Winick's limited assets resulted directly from his lavish spending, his intentional efforts to divest himself of property, and his use of his businesses to fund his lifestyle.

F. Final Effort to Divest Property: The SDSDR111 LLC Transaction

51. Mr. Winick's efforts to evade payment of his tax liabilities continued up to the month before he filed for bankruptcy. In July 2020, Mr. Winick transferred a multi-million dollar interest in SDSDR111 LLC to his friend and creditor David Berley in an effort to frustrate the IRS's ability to collect on his unpaid taxes through this bankruptcy.

52. As background, by 2006 at the latest, Winick obtained a 25% interest in SDSDR111 LLC, a limited liability company that owns, subject to a mortgage, the commercial space located in 545 W. 111th St., New York, New York 10025. As recently as October 9, 2019, the property owned by SDSDR111 LLC was valued at $31,000,000.00. Pursuant to the operating agreement of

SDSDR111 LLC, Mr. Winick was entitled to distributions from SDSDR111 LLC proportional to his interest therein.

53. Pursuant to 26 U.S.C. § 6321, a lien in favor of the IRS attached to Mr. Winick's interest in SDSDR111 LLC arising out of his 2012 tax liability when this tax was assessed on November 18, 2013. Pursuant to 26 U.S.C. § 6323, the Internal Revenue Service recorded this lien with the New York County Register Office on May 19, 2014. Mr. Winick's attorney was informed at the time the notice of federal tax lien was filed.

54. Notwithstanding the IRS's lien, on January 29, 2015, Mr. Winick pledged a "first priority lien and continuing security interest in" his shares in SDSDR111 LLC to his friend and business associate David Berley in exchange for a $500,000.00 loan. On February 5, 2015, Mr. Winick recorded this security interest with the New York Department of State. Over the next few years, Mr. Winick made no principal payments on this loan, yet Mr. Berley continued to extend him additional credit, up to $1,627,500.00 by November 1, 2019.

55. Mr. Winick failed to make numerous interest payments on this loan in 2019, but Mr. Berley declined to call for full payment of the outstanding principal, as he was entitled to do under the terms of his agreement with Mr. Winick. However, on July 9, 2020—just over one month before Mr. Winick filed for bankruptcy—Mr. Berley notified Mr. Winick that he had defaulted on the loan by failing to make a $24,412.50 interest payment on May 1, 2020. Mr. Berley demanded full payment of the loan.

56. On July 24, 2020, Mr. Winick satisfied the $1,658,693.70 loan by transferring his interest in SDSDR111 LLC to Mr. Berley. Mr. Winick did not attempt to sell his interest in SDSDR111 LLC such that any surplus could be used to pay his debts to the IRS, nor did he notify the IRS that he was transferring his interest, so that the IRS could defend its lien.

57. Mr. Winick filed for bankruptcy just over one month later.

58. Upon information and belief, Mr. Winick orchestrated the events leading up to his default in anticipation of his bankruptcy in an effort to transfer his interest in SDSDR111 LLC to his preferred creditor rather than the IRS, with knowledge of the IRS's interest in his stake in SDSDR111 LLC.

G. Attempt to Conceal the Value of Winick Realty and WTN

59. Having divested himself of his interest in SDSDR111 LLC, Mr. Winick owned only two substantial assets when he declared bankruptcy—a 22.5% stake in Winick Realty, and a 60% stake in WTN, an entity that has as its sole asset a 67.5% interest in Winick Realty.

60. On May 24, 2013, Mr. Winick's accounting firm conducted a valuation of Winick Realty and WTN—utilizing methodologies known as the "Income Approach" to value Winick Realty and the "Asset-Based Approach" to value WTN. Mr. Winick's accountants determined that Winick Realty had a fair market value of $10,346,000.00 and that WTN had a fair market value of $6,277,500.00.

61. In connection with a potential sale of Winick Realty, the same accountants again conducted a valuation of Winick Realty on September 26, 2018. This time, the accountants valued Winick Realty at $6,000,000.00 using the "Cost or Asset Approach," $11,300,000.00 using the "Income Method," and $12,600,000.00 and $8,500,000.00 utilizing two variations of the "Market Approach." Reconciling these valuation methodologies, the accountants reached a fair market value of $7,367,000.00.

62. Mr. Winick continued to contemplate a sale of Winick Realty at least through November 1, 2019, when he included "recei[pt] of his pro rata share of the proceeds from the sale

of 'Winick Realty'" as a condition requiring payment of principal on the loan from Mr. Berley, discussed above.

63. Despite Mr. Winick's historic ability to value Winick Realty and WTN, and despite his years-long interest in selling Winick Realty, Mr. Winick listed his interests in both Winick Realty (22.5%) and WTN (60%, holding a 67.5% interest in Winick Realty) as having "unknown" value in his schedules.

64. These interests had significant value at the time they were scheduled by Mr. Winick. Months later, valuation consultants from Duff & Phelps LLP conducted a preliminary assessment of the value of Winick Realty relying on the same methods that Mr. Winick's accountants relied upon in 2013 and 2018 and determined that Winick Realty was worth between $3,369,588.00 and $11,841,397.00, consistent with the accountants' earlier valuations.

65. Upon information and belief, Mr. Winick knew at the time he filed his bankruptcy petition that Winick Realty had significant, ascertainable value, based on his experience valuing Winick Realty in the past.

66. Upon information and belief, Mr. Winick scheduled his interests in Winick Realty and WTN as having "unknown" value to avert attention from them and persuade the Chapter 7 estate to abandon those interests.

67. This strategy was consistent with other aspects of Mr. Winick's bankruptcy filing. He listed the value of his Rolex watches as $5,000.00, but Christi Sothers Fine Jewelry appraised them at $47,500.00 only months later. Further, Mr. Winick included $134,000.00 in monthly payments for back taxes in the expenses section of his schedules, despite the fact that he had not made a payment to the IRS in over six months.

## COUNT I

### Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(2)(A)

68. The allegations contained in paragraphs 1 through 67 are incorporated by reference as if fully set forth herein.

69. The Court may deny discharge if "the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A).

70. Mr. Winick transferred his interest in SDSDR111 LLC to Mr. Berley within one year prior to filing bankruptcy to hinder, delay or defraud the IRS's ability to collect from him, with knowledge that the IRS had a superior interest in that property at least to the extent the value exceeded the debt, and without requiring a foreclosure sale on the property that, given the $31,000,000.00 value of the property owned by SDSDR111 LLC, could have resulted in surplus value that could have been used to pay the IRS.

71. Mr. Winick's conveyance of his interest in SDSDR111 LLC to Mr. Berley was marked by many "badges of fraud," *see In re Kaiser*, 722 F.2d 1574, 1583 (2d Cir. 1983), which establish his intent to defraud the IRS, including that:

(a) he pledged this asset as collateral and then transferred it with knowledge that the IRS had a lien interest in it;

(b) he transferred this interest within one year before filing for bankruptcy to satisfy a debt with lower value than that of the interest pledged;

(c) he transferred this interest to a personal friend;

(d) he was left without meaningful assets to pay his remaining creditors in his ensuing bankruptcy; and

(e) he transferred this asset as part of a pattern of divesting himself of substantial assets after he had incurred substantial tax debts.

**COUNT II**

**Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(4)**

72. The allegations contained in paragraphs 1 through 71 are incorporated by reference as if fully set forth herein.

73. The Court may deny a debtor a discharge if "the debtor knowingly and fraudulently, or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4).

74. In this bankruptcy, Mr. Winick filed a petition, its attendant schedules, and his Statement of Financial Affairs, certifying, under penalty of perjury, that each was true and correct to the best of his knowledge, information, and belief.

75. Nevertheless, Mr. Winick scheduled his interests in Winick Realty and WTN as having "unknown" value, despite having had no problem appraising these valuable assets on multiple occasions in the past.

76. In addition, he scheduled the value of his Rolex watches at almost ten times less than the value for which they were ultimately appraised and sold.

77. When a debtor schedules a valuable asset as having "unknown" or minimal value despite having been able to value the asset in the past, their statement has "the effect of a lie," *In re Silver*, 367 B.R. 795, 815 (Bankr. D.N.M. 2007), requiring denial of discharge pursuant to 11 U.S.C. § 727(a)(4)(A).

## COUNT III

### Nondischargeability of Tax Debt for Tax Year 2019 Pursuant to 11 U.S.C. §§ 523(a)(1)(A) and 507(a)(8)(A)(i)

78. The allegations contained in paragraphs 1 through 77 are incorporated by reference as if fully set forth herein.

79. Pursuant to 11 U.S.C. § 523(a)(1)(A), a tax debt is not dischargeable under to 11 U.S.C. § 523(a)(1)(A) if it is "of the kind and for the periods specified in section . . . 507(a)(8) of this title." Section 507(a)(8)(A)(i), in turn, applies to "a tax on or measured by income or gross receipts for a taxable year ending on or before the date of the filing of the petition for which a return, if required, is last due, including extensions, after three years before the date of the filing of the petition."

80. Mr. Winick filed his bankruptcy petition on August 27, 2020. Because his income tax return for tax year 2019, described in paragraph 29 above, was not due until April 15, 2020—within three years of the date of his petition—his tax, interest, and penalty liabilities are covered under § 507(a)(8)(A)(i) and exempted from discharge pursuant to 11 U.S.C. § 523(a)(1)(A). His corresponding penalties are further exempted from discharge pursuant to 11 U.S.C. § 523(a)(7).

## COUNT IV

### Nondischargeability of Tax Debts for Tax Years 2012 through 2016 and 2019 Pursuant to 11 U.S.C. § 523(a)(1)(C)

81. The allegations contained in paragraphs 1 through 70 are incorporated by reference as if fully set forth herein.

82. Pursuant to 11 U.S.C. § 523(a)(1)(C), a tax debt is not dischargeable under to 11 U.S.C. § 727 where a debtor "made a fraudulent return or willfully attempted in any manner to evade or defeat such tax."

83. The tax, interest, and penalty liabilities incurred by Mr. Winick for tax years 2012 through 2016, described above in paragraphs 24 through 28, are excepted from discharge under § 523(a)(1)(C) because Mr. Winick willfully attempted to evade or defeat these taxes in one or more of several ways including:

(a) Repeatedly, year after year, significantly under-withholding income taxes form his income, despite knowing from prior tax years that his withholdings were nowhere near sufficient to cover his tax obligations;

(b) Repeatedly, year after year, failing to make quarterly estimated payments of taxes, despite having notice from the IRS of the need to do so;

(c) Failing to make voluntary payments towards outstanding tax obligations;

(d) Transferring substantial assets, including interests in WTN, Winick Realty Group NJ, and SDSDR111 LLC, to friends and family members for inadequate or no consideration while owing significant tax debts to the IRS;

(e) Structuring his assets so that the IRS would not have property to collect against by leasing all of the substantial real and personal property he utilized;

(f) Spending significant sums of money on non-essential things, like luxury apartments, vacation homes, high-stakes gambling, and private school tuition, while ignoring debts owed to the IRS;

(g) Using his companies to pay personal expenses like luxury car leases and debts owed to friends, rather than paying these expenses out of his own bank accounts that the IRS might readily levy;

(h) Concealing the value of his personal property and business interests in his bankruptcy schedules by underestimating or failing to estimate their value;

(i) Negotiating three separate installment agreements with the IRS, but failing on each occasion to abide by their payment schedules; and

(j) Preventing the IRS from collecting his outstanding debts for over a year by filing an offer-in-compromise of $430,000.00 to compromise over $7,000,000.00 in tax liabilities.

84. At least some of Mr. Winick's corresponding penalties are also exempted from discharge pursuant to 11 U.S.C. § 523(a)(7).

WHEREFORE, the United States of America respectfully requests that this Court enter the following relief:

A. Deny Mr. Winick a discharge; or

B. Determine that the federal income tax liabilities of Mr. Winick for tax years 2012 through 2016 and 2019, including interest and penalties, are nondischargeable; and

C. Award the United States of America its costs in this action, and such other and further relief as the Court determines is just and proper.

Dated: New York, New York
May 14, 2021

AUDREY STRAUSS
United States Attorney for the
Southern District of New York
*Attorney for the United States of America*

By: /s/ Zachary Bannon
ZACHARY BANNON
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
Telephone: (212) 637-2728
Facsimile: (212) 637-2717
Email: Zachary.Bannon@usdoj.gov